| | | |
|---|---|---|
| JUDY MARIE REED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:08CV1169 TIA |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

This cause is on appeal from an adverse ruling of the Social Security Administration.  The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

### I.    Procedural History

Plaintiff is proceeding in this cause without the assistance of retained counsel.  Plaintiff's Complaint was filed on August 8, 2008.  On September 10, 2008, the Court entered a Case Management Order setting out the briefing schedule to be followed in this cause in accordance with Rule 9.02 of the Local Rules of this Court.  After requesting and receiving additional time in which to file the answer, Defendant Commissioner of Social Security timely filed his Answer to Plaintiff's Complaint on December 2, 2008.  On February 19, 2009, the undersigned ordered Plaintiff to file a Complaint setting forth allegations why the decision of the Commissioner was not based on substantial evidence.  Plaintiff filed a Complaint but she failed to set forth with specificity any error in his determination except his failure to award benefits.  Plaintiff contends that the final decision of the Commissioner was not based on substantial evidence because:

> I fill[sic] it was wrong for social security to not approved[sic] me because I still have disability for some time. I go on myself a lot. I had kidney cancer (my right kidney was removed). I have fibromyalgia. I also have lupus. I have depression, too. I also have seizures. I also have arthritis. These diseases will not go away ever. There's no cure. You can talk to my Doctor if you want, he will tell you all of these that I have. I even have a handicap car. Thank you - Judy Reed (I don't see why I wouldn't be approved). (I should have been approved a long time ago).

Plaintiff's Complaint for Judicial Review of Decision of the Commissioner of Social Security (Docket No. 19/filed February 25, 2009). Thereafter, the undersigned entered an Order directing Plaintiff to inform the Court, in writing, whether she intended to pursue her claims based solely on the allegations made in her Complaint, or whether she wished to pursue her claims by way of a separate Brief in Support of Complaint. The record shows that Plaintiff failed to comply with the Order. On November 5, 2009, the Court entered an Order directing Plaintiff to either file a brief in support of her complaint or a pleading stating that she intends to pursue her claims solely on the allegations made in her Complaint. Plaintiff timely complied with the Court's directive by filing a responsive pleading construed as a request to proceed based on the claims made in her Complaint.

On February 1, 2006, Claimant filed an application for Supplemental Security Income payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq. (Tr. 95-97) and an application for Disability Insurance Benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq. (Tr. 98-102).[1] In the Disability Report Adult completed by Claimant and filed in conjunction with the application, Claimant stated that her disability began on January 1, 2003, due to lupus, ANA, arthritis, neurological problems/seizures. (Tr. 115-23). On

---

[1]"Tr." refers to the page of the administrative record filed by Defendant with its Answer (Docket No. 17/filed December 2, 2008).

initial consideration, the Social Security Administration denied Claimant's claims for benefits. (Tr. 65-69). Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 73). On June 21, 2007, a hearing was held before an ALJ. (Tr. 26-61). Claimant testified and was represented by counsel. (Id.). Vocational Expert Brenda Young also testified at the hearing. (Tr. 58-60, 93-94). Thereafter, on August 2, 2007, the ALJ issued a decision denying Claimant's claims for benefits. (Tr. 11-23). After considering the request for review, Plaintiff's contentions in support of disability, and the surgical pathology & non-gynecologic cytopathology report dated September 29, 2007, the Appeals Council found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision on July 25, 2008. (Tr. 1-8).[2] The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.     Evidence Before the ALJ

### A.  Hearing on June 21, 2007

#### 1.  Claimant's Testimony

At the time of the hearing, Claimant was forty-six years of age. (Tr.). Claimant testified that her date of birth is November 4, 1971, and she completed the ninth grade. (Tr. 30). Claimant took the GED. (Tr. 30). Claimant testified that she lives in Warrenton with her mother-in-law, step-mother-in-law, and father-in-law. (Tr. 31).

Claimant last worked two years earlier as a cashier at a gas station. (Tr. 31). Her duties

---

[2]The undersigned interprets the Appeals Council's statement that the additional evidence did not provide a basis for changing the ALJ's decision a finding that Plaintiff's letter and the medical exhibit attached thereto were not material. See Bergmann v. Apfel, 207 F.3d 1065, 1069-70 (8th Cir. 2000) (whether additional evidence meets criteria is question of law; to be material, evidence must be relevant to claimant's condition for time period for which benefits were denied, and must not merely detail after-acquired conditions or post-decision deterioration of pre-existing condition).

included sweeping, mopping, cleaning up, and taking out the trash. Claimant left the position after two weeks because of her medical problems. (Tr. 31). Before the gas station position, Claimant worked as a cashier in a fast food restaurant. (Tr. 32). Her job duties included working the front counter, mopping, wiping the tables, and cleaning the bathrooms. Claimant worked in that position for a month but left when she moved. (Tr.32). Claimant worked at MEMC in 2004 washing round discs while standing. (Tr. 33). Claimant left the position after a month after injuring her back lifting ingots. (Tr. 33). In 2003, Claimant worked as a cashier at Wal-Mart for five months, but she left the job due to lack of housing. (Tr. 34). In 2003, Claimant worked as a cashier at Kroeger. (Tr. 35). In 2002, Claimant worked as a cashier in the pharmacy at Walgreen's, but she was laid off from the position. (Tr. 35). Claimant also worked in Steak N' Shake as a waitress, a front counter worker, and a dishwasher. (Tr. 36). In 2001, Claimant worked as a cashier at Citgo and then at McDonald's. Her job duties included sweeping and mopping the floors. (Tr. 37). In 1999, Claimant worked at Country Kitchen as a waitress, but she left the position because of a move. (Tr. 38). In 1998, Claimant worked at Lakeside Pets bathing pets for three months. (Tr. 38).

Claimant testified that she sees Dr. Baldassare who recently diagnosed her with lupus and fibromyalgia. (Tr. 40). Claimant has joint pain in her legs and the joint pain in her elbows prevents her from sleeping through the night. (Tr. 41). Claimant described her pain as an aching and sharp pain. (Tr. 42). Nothing alleviates her pain. (Tr. 43). Claimant takes prescribed medication for her anxiety and Prozac prescribed by her psychiatrist for depression. (Tr. 50). Claimant testified that she does not experience as many crying spells now that she is taking Prozac. (Tr. 53). Claimant experiences panic attacks three to four times a week and feels like she

cannot breath. (Tr. 51). Claimant testified that taking her medication helps. (Tr. 51). Going either up or down stairs triggers a panic attack, because Claimant is scared of falling. (Tr. 52).

Claimant testified that she can walk to the mailbox without becoming short of breath. (Tr. 45). Over a six-month time period, Claimant lost almost sixty pounds. (Tr. 46). Claimant testified that she can stand for five minutes but she has to sit down, because her back starts hurting. (Tr. 47). Claimant has problems sitting. (Tr. 48). Claimant can lift a gallon of milk and most likely can lift five to seven pounds. (Tr. 48).

As to her daily activities, Claimant testified that she can dress without assistance, and her husband helps her with the dishes. (Tr. 43). Claimant testified that she does not feel like doing anything, not even watching television. (Tr. 44). Her husband takes her grocery shopping. Claimant testified that she does not drive. (Tr. 45). Claimant has problems sleeping at night and wakes up around 4:00 in the morning. (Tr. 48). Claimant takes her medication. (Tr. 49). Claimant spends most of the time at home either sleeping or watching television. (Tr. 50, 55). Her husband fixes her something to eat. (Tr. 55). Claimant loses her train of thought at times, and her memory is not good. (Tr. 54). Claimant used to enjoy swimming, fishing, horse back riding, and camping. (Tr. 54).

### 2. Testimony of Vocational Expert

Vocational Expert Brenda Young, a certified rehabilitation counselor, a certified disability management specialist, and a licensed professional counselor, testified in response to the ALJ's questions. (Tr. 58-60, 93-94). In response to the ALJ's question asking her to characterize Claimant's past work, Ms. Young noted Claimant's past work as a cashier to be unskilled based on the training periods and light, the fast food to be unskilled and light, and the waitress to be

unskilled and light. (Tr. 59).

The ALJ asked the vocational expert to assume as follows:

> a hypothetical individual able to lift and carry fifty pounds occasionally, twenty-five pounds frequently who could stand and/or walk for up to six hours in an eight-hour day with normal breaks, sit for up to six hours in eight-hour day with normal breaks who could engage in no more than occasional climbing; should avoid concentrated exposure to hazards. I f you were to consider those factors alone would any of those past jobs be possible?

(Tr. 59). Ms. Young responded that all of the past jobs would be possible. (Tr. 59).

Next, the ALJ asked the vocational expert to assume as follows for the second

hypothetical:

> to consider a worker able to lift and carry 20 pounds occasionally, 10 pounds on a frequent basis who should not engage in climbing such as ladders or scaffolds on the job; no more than occasional use of ramps or stairs, balancing, stooping, kneeling, crouching, no crawling; would be limited to jobs involving understanding, remembering and following simple instructions and directions in a routine environment; less than occasional contact with the general public. If you were to use that combination of factors as a residual functional capacity would any of the past jobs be possible?

(Tr. 59). Ms. Young indicated only the fast food jobs that were janitorial and front of the house

would be possible. (Tr. 59-60). Ms. Young noted that her testimony is consistent with the

Dictionary of Occupational Titles ("DOT") and the Selected Characteristics of Occupations with

the exception of the cashier positions being listed in the lower end of the semi-skilled range by the

DOT inasmuch as such positions are usually learned in thirty days. (Tr. 60).

### 3. Forms Completed by Claimant

In the Disability Report Adult, Claimant indicated that she was able to work after the date

her conditions first bothered her. (Tr. 116). Claimant reported her becoming unable to work

because of her symptoms as of January, 2003, but that she stopped working on July 1, 2004. (Tr.

116).

### 4. Explanation of Determination

In the Explanation of Determination, the Social Security Administration made the

following findings:

> 34 yr old CC clmt who alleges lupus, ANA, arthritis, neurological problems
> (seizures). The collective MER in file indicate DX of questionable lupus due to
> ANA, complex migraine headaches, chronic low back pain, lumbar sprain. The
> claimant is receiving antidepressant medication from the primary care MD and she
> has a diagnosis of depression and migraine headaches per her primary care MD.
> After review of the collective MER in file, the clmt mental health is appears non-
> severe.
>
> The clmt is not currently engaging in SGA. The clmt does have MDIs that do not
> meet or equal the listings, however; are more than non-severe. The clmt past work
> has a HX of unskilled SGA work. The clmt current PRFC is limited to medium
> work. The clmt does retain the physical capacity to return to any of her past
> relevant work as she has described.

(Tr. 64).

## III.  Medical Records

On August 2 and 5, 2002, Dr. Richard Buckles at St. Joseph Health Center treated

Claimant for otalgia.  (Tr. 195-98).

In the April 12, 2004, Unity Corporate Health Work Status Worksheet, lumbar

strain/sprain occurring on January 27, 2004 is the illness/injury listed.  (Tr. 188).  At the time of

injury, Claimant worked for Adecco lifting a bar weighing around sixty pounds.  (Tr. 189).  The

medical examiner noted the case to be complicated inasmuch as the injury occurred over two

months earlier.  The examiner noted that Claimant was first treated in the emergency room at St.

Joseph's Hospital and then twice at the Urgent Care Center, but the medical records from the

other treating sources were not available.  Claimant reported not taking any medications and not

having any earlier back problems. The examiner noted that Claimant has not sought medical attention during a two-month period of time. The physical examination revealed no point tenderness over the cervical or thoracic spine. The examiner observed that Claimant walks with relative ease and can go from a sitting to a standing position okay. Claimant's heel/toe and tandem walking were noted to be okay and her forward flexion was about 70 degrees. The examiner determined Claimant to have a lumbar strain and opined that Claimant can do her normal job. (Tr. 189).

On September 8, 2005, Claimant reported back pain caused by lifting at her job at Wal-Mart. (Tr. 230-31). The x-ray showed no evidence for acute osseous injury and lumbar vertebral bodies in normal alignment. (Tr. 233).

Claimant reported experiencing abdominal pain at the emergency room at St. Joseph's Health Center. (Tr. 269, 278-79). Claimant reported working at Wal-Mart. (Tr. 269). Dr. Sayed Hussain admitted Claimant to treat her dizziness and vertigo. (Tr. 270). The ultrasound of Claimant's pelvis showed essentially unremarkable transabdominal images but a transvaginal ultrasound to be performed for further evaluation of Claimant's ovaries. (Tr. 302). Diagnostic imaging of Claimant's pelvis revealed small follicular cysts in both ovaries. (Tr. 303). Dr. Hussain determined that Claimant's back was due to lumbar puncture and treated her with various narcotics. (Tr. 270). Dr. Hussain noted how Claimant was selective in her demands for analgesics stating that some make her sick and others do not work and thus requesting Vicodin. Dr. Hussain prescribed Vicodin for a short period of time. (Tr. 270). The echocardiogram report of September 15, 2005, showed a trace of pulmonic regurgitation. (Tr. 268). Dr. Hussain included in his discharge diagnosis the following: dizziness, ovarian follicular cyst, depression,

migraine headaches, history of anemia, and questionable anxiety, stress with drug seeking behavior. (Tr. 270). Dr. Hussain prescribed a multivitamin, Percocet, Lexapro, Midrin, and Niferex. (Tr. 270-71).

Dr. Ahmet Guler also treated Claimant for her dizziness, loss of consciousness, loss of memory, and abdominal pain. (Tr. 272). In her past medical history, Claimant denied having any cancer. (Tr. 272). Claimant reported taking Aleve and no other medications. (Tr. 273). Examination revealed some tenderness in the lower abdomen. (Tr. 273). In a consultation, Dr. Gary Myers examined Claimant and found Claimant to have a normal neurological examination. (Tr.275-76). Dr. Myers noted that Claimant's husband reported that Claimant's brother had seizures as a child and a sister had a stoke with aphasia in her teens. (Tr. 276). Dr. Myers ordered a MRI of her brain and an EEG. (Tr. 276). The EEG showed no epileptiform discharges noted and EKG tracing showed a regular heart rate. (Tr. 281). The MRI of Claimant's brain showed a few scattered millimeter areas of rounded increased signal within the subcortical white matter and Dr. Fazal Majeed opined that vasculitis is a possibility but less likely inasmuch as there is not significant abnormal enhancement noted. (Tr. 300-01). Dr. Majeed further noted a few millimeter similar appearing density in the left partial lobe and questionably adjacent to the third ventricle on the right and requested old films be made available for comparison. (Tr. 301).

On September 20, 2005, Dr. Sayed Hussain admitted Claimant for treatment to St. Joseph's Heath Center to run a battery of testing after she had been discharged the day before for an episode of slurred speech, confusion, and dizziness. (Tr. 235, 238). Claimant reported experiencing a spell the day before. (Tr. 238). Claimant reported experiencing continued vertigo, unclear etiology and some loss of consciousness during these episodes. (Tr. 245). Dr. Hussain

noted how in the past admission, Claimant to be adamant on receiving pain medications for back pain that is not well characterized. (Tr. 238). Dr. Hussain included in her assessment the following: transient ischemic attack, positive ANA, low back pain, muscle spasm, possible drug seeking behavior, depression, and anemia. (Tr. 239). Dr. Richard Anderson diagnosed Claimant with depression and anxiety associated with her general medical condition. (Tr. 240). The laboratory data showed lupus anticoagulant to be negative and her ANA positive at 1:160. (Tr. 243). The diagnostic imaging of Claimant's thoracic spine showed vertebral bodies to be well aligned and no acute osseous abnormality and the lumbar spine to be normal. (Tr. 253). The MRI of Claimant's brain revealed a few scattered millimeter rounded areas of increased signal within the subcortical white matter. (Tr. 255-56). Dr. Mark Taber performed a transesophageal echocardiogram with the results showing no evidence of cardiac source of embolism and no evidence of foramen ovate, atrial septal defect, or septal aneurysm. (Tr. 247).

Her discharge diagnosis included complex migraine headaches, depression, and a referral to Washington University neurology and rheumatologic department. (Tr. 236). Dr. Guler prescribed Topamax, Enteric coated aspirin, and Lexopro. Treatment included extensive rheumatological workup including ANA which was positive and then turned negative. MRI of Claimant's brain showed a few millimeter rounded areas of increasing lucency within the cortical white matter. The MRI also showed a stroke to be a possibility but less likely since there was no significant abnormal enhancement noted. Dr. Guler noted how during the course of treatment at the hospital, Claimant constantly sought narcotics, but he refrained from prescribing narcotics and recommended none be prescribed inasmuch as there is a high risk of substance dependence and abuse. He extrapolated this opinion based on Claimant's behavior she exhibited during her

hospitalization. (Tr. 236). Dr. Guler recommended that Claimant schedule an appointment at Washington University's neurology department as soon as possible. (Tr. 237).

On October 13, 2005, Claimant sought treatment for back pain at St. Joseph's Health Center. (Tr. 222). Claimant reported the back pain starting after a hospitalization two weeks earlier. (Tr. 223). The emergency room doctor diagnosed Claimant with myofascial lumbar strain. (Tr. 224).

Claimant reported abdominal pain and lower back pain on October 27, 2005. (Tr. 214-16). The diagnostic imaging taken at St. Joseph's Health Center showed no acute cardiopulmonary process, multiple air filled loops of small bowel at the central abdomen, a few of which contain air fluid levels, and stool within the colon. (Tr. 220). The radiologist opined that the findings are concerning for early or partial bowel obstruction. (Tr. 220).

On October 30, 2005, Claimant appeared in the emergency room at St. Joseph's Health Center complaining of dizziness and giddiness but when called into a treating room, Claimant had left the waiting room. (Tr. 211-12).

On November 22, 2005, Dr. Rivera treated Claimant for backache in the emergency room at St. Joseph's Health Center. (Tr. 205). Claimant reported her back pain starting six months earlier. (Tr. 206). Dr. Rivera noted how Claimant had run out of analgesia, Vicodin and diagnosed Claimant with low back pain, anemia, and diarrhea. (Tr. 207).

The December 5, 2005, CT of Claimant's abdomen and pelvis showed a presence of diffuse colitis which may be infectious or inflammatory in origin. (Tr. 204).

On December 6, 2005, Claimant sought treatment in the emergency room at St. Joseph's Hospital for joint/pelvic pain. (Tr. 199). Claimant reported a prior back injury six months earlier.

(Tr. 200).  The treating doctor noted that Claimant is well known to him because of her frequent trips to the emergency room for blood pressure treatment.  (Tr. 201).  The doctor noted how Claimant takes Motrin, but how she has not seen a doctor or a physical therapist since her last visit on November 22, 2005.  The doctor offered Claimant Tylenol and no narcotics and opined Claimant appeared to be mad and wanted to leave.  (Tr. 201).  In the discharge instructions, the doctor ordered Claimant to follow-up with a free clinic or internist for her back pain and to continue taking Tylenol.  (Tr. 202).

Claimant reported having diarrhea and abdominal cramps on January 8, 2006 and having an appointment at Barnes on Tuesday.  (Tr. 316-17).  The x-ray of Claimant's abdomen showed nonspecific nonobstructive bowel gas pattern.  (Tr. 327).

The January 21, 2006, abdominal, pelvic computed tomography showed no significant abnormality.  (Tr. 157).

On January 25, 2006, Claimant reported experiencing abdominal pain starting that day to the treating doctor in the emergency room at St. Joseph's Health Center.  (Tr. 306-07). Examination revealed mild tenderness.  (Tr. 308).  Claimant refused a vitamin but repeatedly demanded pain medication.  (Tr. 309).  Claimant refused pain medications offered.  The treating doctor reviewed her charts from previous emergency room visits in the past two months and noted how other treating doctors had expressed concern in earlier records about Claimant's narcotic-seeking behavior.  The doctor noted how Claimant has repeatedly neglected to pursue follow-up treatment recommended by the doctors but Claimant represented to have an appointment at Barnes on February 14.  After contacting Walgreens, the doctor noted that Claimant had Vicodin prescriptions filled by different physicians on October 25, 2005 (#20),

November 26, 2005 (#20), December 1, 2005 (#20), January 2, 2006 (#20) and January 21, 2006 (#12). Claimant also filled a prescription for Percocet in January. The doctor discussed concerns about pain medications with Claimant, and she became very angry and began shouting about the need for pain control and how she cannot help it if doctors give her narcotics. Claimant refused medications stating she wanted narcotics. Claimant agreed to a Toradol/Benadryl IV. (Tr. 309). The diagnostic imaging of Claimant's abdomen showed contrast within the colon. (Tr. 313).

On February 27, 2006, Dr. Yolanda Lee at Washington University School of Medicine Department of Internal Medicine examined Claimant for an initial GI visit on referral for evaluation of chronic diarrhea and blood per rectum. (Tr. 153). Claimant reported a sudden onset of frequent watery bowel movements, abdominal cramps, and rectal bleeding five months earlier. (Tr. 153).

On April 26, 2006, Dr. Stephen Duncan evaluated Claimant at Barnes Jewish Hospital on referral by her primary care physician, Dr. Yolanda Lee. (Tr. 579, 583). Dr. Duncan noted that Claimant has no prior psychiatric history, but Claimant reports an approximate four month history of worsening depression and anxiety. (Tr. 583). Claimant reported increased stress after her seventy-seven year old father moved in with her eight months ago and over the past three to four months, he has been more needy from a physical standpoint. Claimant takes care of his activities of daily living, having to clean him up, and perform other activities, such as dressing him. (Tr. 583). In addition to anxiety, Claimant reported depressive symptoms including low mood, poor sleep, poor energy, poor interest, increased crying, fluctuating appetite with remarkable weight loss of approximately thirty pounds in the last three months. (Tr. 583-84). Claimant reported having bad anxiety for the last three to four weeks. (Tr. 581). Migraine headaches, questionable

history of lupus, unremitting diarrhea for the last six months, and brain scan showing white spots on her brain are listed as Claimant's past medical history. Topamax and Lexapro are listed as Claimant's medications. (Tr. 584). Dr. Duncan found Claimant to have a major depressive disorder with significant anxiety, single episode, migraine headaches, and family stress and assessed her GAF to be 50. (Tr. 585). Dr. Duncan advised Claimant to remain compliant with medications, to follow up with appointments, and to seek counseling. (Tr. 585). Dr. Duncan prescribed Klonopin at bedtime as needed, increased her Lexapro prescription, and referred Claimant to Provident Counseling. (Tr. 580, 586). Dr. Duncan recommended that Claimant return to the clinic in four weeks. (Tr. 586).

In the Physical Residual Functional Capacity Assessment completed on May 11, 2006, P. Cowan, a disability examiner, listed lumbar sprain as Claimant's primary diagnosis and migraines as her secondary diagnosis with an alleged impairment of questionable lupus. (Tr. 328-35). The examiner indicated that Claimant's exertional limitations included that Claimant could occasionally lift fifty pounds; could frequently lift twenty-five pounds; could stand or walk a total of at least six hours in an eight-hour work day; could sit about six hours in an eight-hour work day; and was unlimited in pushing and pulling in the upper extremities. (Tr. 329). The examiner noted how the collective medical examiners indicate the diagnosis of questionable lupus, complex migraine headaches, chronic lower back pain, and MDI of lumbar sprain. Claimant has okay heel, toe and tandem walking and she is able to forward flexion about 70 degrees. (Tr. 329). The examiner noted that the medical records show that Claimant is taking prescribed medications to control her symptoms and is routinely followed by a doctor. (Tr. 330). The examiner further indicated that Claimant could frequently climb ramps/stairs, kneel, crouch and crawl balance, and

stoop and occasionally climb ladder/rope/scaffolds. (Tr. 330). The examiner found Claimant not to have any manipulative, visual, or communicative limitations established. (Tr. 331-32). With respect to environmental limitations, the examiner determined Claimant has no established limitations except to avoid concentrated exposure to hazards (machinery, heights, etc.). (Tr. 332). In the symptoms section, the examiner opined that Claimant's statements are found to be credible. (Tr. 333).

In the undated Psychiatric Review Technique completed on behalf of Disability Determinations, the examiner determined Claimant to have a 12.04 affective disorders, but his medically determinable impairment does not precisely satisfy the diagnostic criteria, in particular, "depression and anxiety associated with her medical con." (Tr. 336-49). The examiner determined Claimant to have a mild degree of limitation with activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration , persistence, or pace. (Tr. 346). The Consultant's Notes section included in part the following:

There is evidence of possible dependence on narcotic pain medication.

Cl's ADL's describe cognitive impairments such as having difficulty writing, difficulty counting change. She alleges she is recently in a carwreck and has a concussion. She does not prepare meals. However, she can follow written directions. Overall cognitive impairments as described do not appear consistent with MER in file. She does not describe impairments due to depression in her ADL's.

The only diagnosis mental impairment in her record is depression. There is no credible evidence suggesting her depressive symptoms are severe to the point of affecting her vocation functioning. This is non-severe.

(Tr. 348).

On August 30, 2006, Claimant sought treatment at St. Joseph's Health Center for nausea,

lower back pain, abdominal pain, and shoulder pain  (Tr. 368, 371-522).  Claimant was admitted

to the hospital for treatment and various evaluations and consultations by Dr. Simmi Goyle, Dr.

Michele Wood, Dr. Hari Diwakaran, Dr. Katherine Dewey, Dr. Attila Varga, and Dr. Jennifer

Etling.  (Tr. 371-83, 404-05).  A lumbar spine film and bilateral shoulder films were negative.

(Tr. 451-52).  A right upper quadrant ultrasound showed cholelithiasis, nonvisualiztion of the

pancreas secondary to bowel gas.  (Tr. 453).  Dr. Wood prescribed Zonegran for her migraine

headaches.  Because Claimant had elevated lipase and multiple gallstones, the doctors determined

her to be symptomatic cholelithiasis, and she had a laparoscopic cholecystectomy with

intraoperative cholangiograms performed on September 2, 2006 by Dr. Etling.  (Tr. 404-17).

After the surgery, Dr. Etling noted how Claimant has done well complaining of some mild

tenderness in her right upper quadrant and some occasional nausea.  For her anxiety, she was

placed on Xanax which has helped.  For her migraine headaches, Dr. Wood prescribed Zonegran

with some relief.  (Tr. 371).

On October 13, 2006, Dr. James Grimes of the Patients First Health Care treated Claimant

for multiple medical complaints including chronic back pain and watery diarrhea since gallbladder

surgery.  (Tr. 352).  Claimant reported being told by one doctor that she has lupus but a

rheumatologist diagnosed her with ANA positive.  Examination of her back revealed muscle

spasm and tenderness in the right paraspinous muscles from approximately T5 to L1 and

increased with flexion and rotation.  Straight leg test was negative.  Claimant requested a Vicodin

refill and Dr. Grimes refused noting that he felt it more appropriate to prescribe a non-steroidal

antiinflammatory drug such as Motrin and a muscle relaxer.  Dr. Grimes noted that Claimant had

been set up with SSM Physical Therapy and had a follow-up appointment scheduled.  (Tr. 352).

Claimant returned on October 16, 2006, to discuss current symptoms of anxiety and depression. (Tr. 350). Based on conversations with local pharmacies, Dr. Grimes expressed some concerns that both Plaintiff and her husband may have tried accelerated use of Vicodin in the past but more on the part of her spouse. (Tr. 350). Dr. Grimes made a referral to a pain management specialist for evaluation of her back pain and explained that he had found a doctor to accept insurance for pain management, Dr. Nevitt, and a psychiatrist, Dr. Biddy. (Tr. 351). Claimant indicated that she would schedule appointments with the doctors. (Tr. 351). Dr. Grimes prescribed Zoloft as treatment of her anxiety/depression/mood disorder. (Tr. 350).

On October 31, 2006, Claimant received treatment for diarrhea in the emergency room at Barnes Jewish Hospital. (Tr. 523-47). Dr. Christopher Brooks prescribed morphine sulfate and Oxycodone and ordered laboratory, radiology, and EKG tests. (Tr. 534).

In the New Patient Health History form completed on January 8, 2007, Claimant indicated that she has lupus and her reason for treatment was to be prescribed medication for her lupus. (Tr. 559). In a thank-you letter dated January 8, 2007, for referring Claimant for treatment, Dr. Andrew Baldassare of Arthritis Consultants, Inc. noted how he had previously treated Claimant at St. Joseph's Hospital on September 20, 2005, with multiple central nervous system complaints of unclear etiology. (Tr. 548). Dr. Baldassare noted how he treated Claimant for a transient ischemic attack although her work-up was negative and so he placed Claimant on aspirin. Dr. Baldassare noted that although Claimant reports having Systemic Lupus Erythematosus, he does not see where a definite diagnosis has ever been made. Dr. Baldassare noted that Claimant did have a positive antinuclear antibody. Claimant reported having low-grade fevers, joint pain, difficulty walking, and a rash covering her face and thighs. Claimant reported not taking any

- 17 -

medications except for Klonipen and Topamax to treat some shakes she experiences. Claimant reported recently being prescribed Prozac for depression and feeling much better in that regard. Claimant returned for further evaluation for potential Systemic Lupus Erythematosus. Dr. Baldassare noted that Claimant has been disabled for one year and has applied for Social Security disability. Physical examination revealed some acneiform facial lesions and HEENT otherwise unremarkable. In the impression, Dr. Baldassare ruled out Systemic Lupus Erythematosus. Dr. Baldassare prescribed Mobic and Xanax. (Tr. 548).

Claimant called Dr. Baldassare's office on January 12, 2007, complaining of a lot of pain and no relief from Mobic and requesting a pain pill. (Tr. 556). Dr. Baldassare prescribed Percocet and noted that Claimant required a written prescription inasmuch as the prescription cannot be called into the pharmacy. (Tr. 554).

On February 6, 2007, Dr. Keith Garcia, a psychiatrist at Barnes Jewish Hospital, completed an outpatient psychiatry intake assessment on Claimant. (Tr. 571-78). Claimant had previously been treated in the Wohl Clinic by Dr. Loynd starting in April 2006. (Tr. 575). Dr. Loynd prescribed Lexapro and Celexa and Klonopin at bedtime as needed. Claimant returned for re-screening after not having been treated in the clinic for more than six months, to get her medications refilled. Claimant had been diagnosed and treated for anxiety disorder and assessed a GAF of 60. (Tr. 575). Dr. Garcia noted how there is some question in the past as to whether Claimant was abusing pain medications and while being treated in the pain clinic, she broke the contract and therefore was not prescribed any more narcotic pain medication. (Tr. 576). Dr. Garcia found that Claimant has multiple symptoms consistent with a diagnosis of somatization disorder and significant anxiety. (Tr. 577). Dr. Garcia noted how Claimant failed to follow-up

with outpatient counseling and how she would likely benefit from supportive therapy and possibly cognitive behavioral therapy. (Tr. 577-78). Claimant does have Medicaid insurance. (Tr. 578). Dr. Garcia increased Claimant's Prozac to 30 mg, refilled her Klonopin prescription, and provided supportive therapy. (Tr. 578).

Claimant called on February 7, 2007, requesting a prescription for a pain medication and Dr. Baldassare prescribed Darvocet. (Tr. 553). Claimant called again the next day reporting the Darvocet not working and making her sick and requesting another pain medication. Dr. Baldassare prescribed Dolobid. (Tr. 553). On February 18, 2007, Claimant called requesting a Darvocet refill. (Tr. 552). The progress note includes a notation that the Darvocet prescription had been given on February 7, 2007. Claimant was given a doctor's name for pain management. On February 19, 2007, Claimant called requesting a different pain medication, either Lortab or Percocet. (Tr. 552). On March 13, 2007, Dr. Baldassare's office called in a Vicodin prescription with no refills. (Tr. 551). The pharmacist noted how Claimant has multiple doctors and pharmacies she and her husband use for their Vicodin prescription refills. There is a notation that Claimant is aware this is the last prescription Dr. Baldassare would prescribe and that she needs to see a pain management specialist. (Tr. 551). On March 20, 2007, Claimant contacted the office inquiring into which lupus medication would be prescribed. (Tr. 550).

On March 7, 2007, Claimant returned for a follow-up visit with a psychiatrist at Barnes Jewish Hospital. (Tr. 567). The doctor increased her Prozac prescription from 30 mg to 40 mg a day and recommended that Claimant return in one month or earlier if she experienced problems. (Tr. 568). The doctor noted that Claimant's symptoms had improved since the last visit and she would benefit from continued relaxation and listening to country music. (Tr. 570).

In a "To Whom It May Concern" letter dated June 18, 2007, Dr. Baldassare noted his treatment of Plaintiff as follows:

> Judy Reed was initially seen in consultation at St. John's Mercy Medical Center on September 20, 2005. She has also been seen in my office on three occasions since then. The first was on October 13, 2005 and then again in January 2007. Her last visit was on 6/18/07. Since her medical records were previously sent to her attorney, enclosed is my office note of the 6/18/07 visit. She has been seen for Systemic Lupus Erythematosus with polyarthritis, skin rash, anemia, and fibromyalgia. She presently is on Plaqueril 200 mg once daily, Arava 20 mg, and iron supplementation. She also is to see Pain Management.
>
> She is unable to sit or stand for more than one hour. She is not able to walk, push, pull, bend or stoop. She can only lift up to 10 lb. For all of these reasons, she is unable to seek gainful employment.

(Tr. 589).

## IV.   The ALJ's Decision

The ALJ found that Claimant met the disability insured status requirements through March 30, 2009. (Tr. 16). The ALJ found that Claimant has not engaged in substantial gainful activity since January 1, 2003, the alleged onset date of disability. The ALJ found that the medical evidence establishes that Claimant has the medically determinable impairments of anxiety disorder, not otherwise specified, and somatization disorder, but her medically determinable impairments do not meet or equal one of the listed impairments set forth Appendix 1, Subpart P, Regulations No. 4. The ALJ further determined that Claimant did not have an impairment or combination of impairments that significantly limited her ability to perform work related-activities for twelve consecutive months. The ALJ opined that Claimant's allegations regarding the intensity, persistence, and limiting effects of her symptoms are not credible. (Tr. 22). The ALJ opined that Claimant is not disabled.

## V.    Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); <u>see</u> <u>also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the individual is engaged in "substantial gainful activity."  If she is, then she is not eligible for disability benefits.  20 C.F.R. § 404. 1520(b).  If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant is not found to have a severe impairment, she is not eligible for disability benefits.  If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling.  If the impairment is specifically listed or is equal to a listed impairment,

the claimant will be found disabled.  20 C.F.R. § 404.1520(d).  If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work.  If the claimant can still perform past work, she is not disabled.  20 C.F.R. § 404.1520(e).  If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy.  In step five, the ALJ must consider the claimant's "age, education, and past work experience."  Only if a claimant is found incapable of performing other work in the national economy will she be found disabled.  20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole."  Pearsall, 274 F.3d at 1217.  Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Id.  The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  The Court will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'"  Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008) (quoting Nicola v. Astrue, 480 F.3d 885, 886 (8th Cir. 2007)).  Although  the Court might have reached a different conclusion

had it been the initial finder of fact, this does not make the ALJ's decision outside the 'zone of choice.' Id. Rather, "[i]f after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision. Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The claimant's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the claimant's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

At the outset, the undersigned notes that the fact that Claimant did not allege cancer in her applications for disability benefits is significant. In her applications for disability benefits, Claimant alleged disability due to lupus, ANA, arthritis, neurological problems/seizures. The ALJ found Claimant did not have an impairment or combination of impairments that significantly limited her ability to perform work related-activities for twelve consecutive months. A review of Claimant's applications shows that Claimant failed to allege cancer as a basis for disability. See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (failure to allege disabling mental

impairment in application is significant, even if evidence of depression was later developed). Claimant did not testify at the hearing that cancer affects her ability to function, and the ALJ fulfilled his duty of investigating this claim not presented in the applications for benefits but for the first time raised by Claimant in a pleading.

The undersigned finds the record is devoid of any evidence supporting Claimant's contention that she has cancer. First, Claimant never alleged that her cancer was disabling, and she presented no medical evidence substantiating this claim. Claimant never alleged any limitation in function as a result of her cancer in her application for benefits or during the hearing. Indeed, the medical evidence is devoid of any support. Claimant failed to provide any medical records showing that she received any medical treatment for cancer. The record not only fails to contain substantial evidence to support such a claim, but it contains virtually no evidence to support Claimant's argument. The ALJ is under "no obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) (quoting Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996)). Accordingly, this claim is without merit.

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ erred by not finding lupus and fibromyalgia to be severe impairments.

A.                    Severity of Claimant's Impairments

Claimant argues that the ALJ's decision is not supported by substantial evidence on the

record as a whole, because the ALJ erred by not finding fibromyalgia and lupus to be severe impairments.

A review of the record shows that the ALJ found Claimant's impairments did not significantly limit her ability to perform basic work-related activities and, therefore, the ALJ determined that Claimant did not have any severe impairments. Brown v. Bowen, 827 F.2d 311, 312 (8th Cir. 1987) ("'[O]nly those claimants with slight abnormalities that do not significantly limit any 'basis work activity' can be denied benefits without undertaking' the subsequent steps of the sequential evaluation process.'") (quoting Bowen v. Yuckert, 482 U.S. at 158). At Step 2 of the sequential evaluation, the ALJ determined Claimant's impairments not to be severe, finding that there was no evidence that her symptoms and limitations were of sufficient severity to prevent the performance of all sustained work activity. See, e.g. Kirby v. Astrue, 500 F.3d 705, 707-09 (8th Cir. 2007) (impairment is not severe if it is only slight abnormality that would not significantly limit mental ability to do basic work activities; claimant bears the burden of establishing impairment's severity).

As discussed by the ALJ, the record is devoid of medical diagnosis of either fibromyalgia or lupus. The ALJ noted that no physician had ever made any medically necessary restrictions, restrictions on her daily activities, or functional or physical limitations. Further, the ALJ noted that despite her allegations of persistent pain, Claimant has not received ongoing medical attention or treatment for her pain. Kelley v. Barnhart, 372 F.3d 958, 961 (8th Cir. 2004) ("Infrequent treatment is also a basis for discounting a claimant's subjective complaints."); See Johnson v. Chater, 108 F.3d 942, 947 (8th Cir. 1997) (determining that failing to seek treatment was inconsistent with claimant's subjective complaints of disabling pain); Chamberlain v. Shalala, 47

F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993) (lack of ongoing treatment is inconsistent with complaints of disabling condition).

Fibromyalgia, a chronic condition recognized by the American College of Rheumatology ("ACR"), is inflammation of the fibrous and connective tissue, causing long-term but variable levels of muscle and joint pain, stiffness, tenderness, and fatigue.  See Jeffrey Larson, Fibromyalgia, in 2 The Gale Encyclopedia of Medicine, 1326-27 (Jacqueline L. Longe et al. eds, 2d ed. 2002).  Fibromyalgia is diagnosed based on a history of at least three months of widespread pain with tenderness in at least eleven of the eighteen tender-point sites known as trigger points. Id.  Treatments include massage, trigger-point injections, proper rest and diet, physical therapy, patient education, and medication such as muscle relaxants, antidepressants, and anti-inflammatory pain medications.  Id.

In her applications for disability benefits, Claimant alleged disability due to lupus, ANA, arthritis, neurological problems/seizures.  The ALJ found Claimant not to have an impairment or combination of impairments that has significantly limited her ability to perform basic work-related activities for twelve consecutive months.  The Social Security regulations define a nonsevere impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities.  See 20 C.F.R. §§ 404.1521(a), 416.921(a).  Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting.  See 20 C.F.R. §§ 404.1521(b), 416.921(b).

In finding Claimant's fibromyalgia and lupus not to be severe impairments, the ALJ not only questioned whether Claimant has a diagnosis of either fibromyalgia or lupus, he determined that the fibromyalgia did not have more than a minimal impact upon the Claimant's ability to engage in basic work-related activities such that it did not satisfy 20 C.F.R. §§ 404.1521 and 404.921.

The record shows that the ALJ did consider the nature of fibromyalgia in reaching his decision. The ALJ mentions the trigger points used to diagnose fibromyalgia, the clinical signs of fibromyalgia, and the evidence of some of the other symptoms of fibromyalgia, such as reduced range of motion. The Court finds Claimant's contention that the ALJ erred in failing to find her fibromyalgia to be a severe impairment and to determine its effect on her limitations to be without merit. Fibromyalgia has the potential to be disabling. Forehand v. Barnhart, 364 F.3d 984, 987 (8th Cir. 2004) (noting (1) fibromyalgia is a chronic condition, usually diagnosed after eliminating other conditions; (2) no confirming diagnostic tests exist; (3) the Eighth Circuit has long recognized fibromyalgia might be disabling). The Secretary has noted that fibromyalgia is medically determinable and that the presence of certain symptoms, including the presence of focal trigger points, may be sufficient to establish the diagnosis. See Social Security Ruling 99-2p; Brosnahan v. Barnhart, 336 F.3d 671, 678 (8th Cir. 2003) ("objective medical evidence of fibromyalgia [includes] consistent trigger-point findings.").

The ALJ found that Claimant does not have a definitive diagnosis of medically determinable fibromyalgia or lupus. Although Dr. Andrew Baldassare noted on January 8, 2007, how Claimant reported having Systemic Lupus Erythematosus, he does not see where a definite diagnosis has ever been made and in a follow-up visit, Dr. Baldassare ruled out Systemic Lupus Erythematosus. Nonetheless, in the June 18, 2007, letter Dr. Baldassare noted how Claimant has

been seen for Systemic Lupus Erythematosus with polyarthritis, skin rash, anemia, and fibromyalgia. The ALJ did not give significant weight to the letter inasmuch as Dr. Baldassare's opinion set forth in the letter was inconsistent with his own treatment records. The undersigned agrees that substantial evidence supports the ALJ's refusal to give the opinions set forth in the letter controlling weight inasmuch as his own treatment notes contain no diagnosis of lupus or fibromyalgia and no indications of total disability. Indeed, Dr. Baldassare did not examine Claimant at the time he issued the letter finding Claimant unable to seek gainful employment and unable to sit or stand for more than one hour and unable to walk, push, pull, bend or stoop, and restricted in lifting no more than ten pounds. Dr. Baldassare's findings were inconsistent with his own examination findings and the medical evidence on the record.

The ALJ considered the medical record and the diagnoses by all the treating physicians and explained why he was crediting the diagnosis of some of the doctors and not crediting the diagnosis of other doctors. Based on the objective medical evidence, the ALJ determined Claimant's fibromyalgia and lupus not to be severe impairments, and the undersigned finds that substantial evidence supports the ALJ's determination. The undersigned notes that where there are conflicts in the evidence, the resolution of such conflicts is for the Commissioner, and not the Court, to make. Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000); Beasley v. Califano, 608 F.2d 1162, 1166 (8th Cir. 1979). This is so even when the medical evidence is in conflict. Cantrell, 231 F.3d at 1107; Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)("Where the medical evidence is equally balanced, ... the ALJ resolves the conflict."). "It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted).

Nonetheless, the ALJ then addressed several inconsistencies in the record to support his conclusion that Claimant's complaints of constant pain were not credible. The credibility of Claimant's subjective complaints is especially important, because Claimant alleges one of her severe impairments is fibromyalgia. Specifically, the ALJ noted that no treating physician stated that Claimant was disabled or unable to work.[3] See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints). In addition, the ALJ noted that no physician had ever made any medically necessary restrictions, restrictions on her daily activities, or functional or physical limitations. The ALJ considered Claimant's work history, and noted the record revealed sporadic levels of work activity and thus never demonstrated a consistent motivation to work. Likewise, the ALJ noted that Claimant received minimal or conservative medical treatment. See Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993)(lack of ongoing treatment is inconsistent with complaints of disabling condition). The medical record is devoid of any evidence showing that Claimant's condition had deteriorated or precluded her from working in the past. See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) (claimant not considered disabled when claimant worked with an impairment over a period of years absent significant

---

[3] The ALJ discredited Dr. Baldassare's opinion set forth in the letter dated June 18, 2007, that claimant is unable to work inasmuch as there was no substantive evidence to support this opinion and refuted by his own treatment notes and physical findings.

deterioration).[4] Indeed, the ALJ stated that despite Claimant's testimony regarding constant pain, the medical evidence shows that Claimant routinely alleged generalized pain in the process of engaging in drug seeking behavior and routinely requested narcotic pain medications be prescribed. See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003) (noting that the record supported ALJ's finding concerning applicant's possible overuse of pain medication in discrediting applicant). Likewise, the ALJ stated the record failed to reveal that Claimant suffered severe side-effects of any medications. Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001); Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999). In addition, the ALJ opined that Claimant's pain magnification behavior and drug seeking behavior further diminished her credibility.

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before him and set out the inconsistencies detracting from Claimant's credibility. See Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003) (if ALJ explicitly discredits claimant and gives good reasons for doing so, the courts normally defer to his credibility determination). The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ pointed

---

[4]Claimant testified that she left various cashier positions for various reasons but none due to any impairment except for the last position working as a cashier at a gas station. Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work. See Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) (claimant left his job because the job ended; therefore, not unreasonable for the ALJ to find that his suggested impairments were not as severe as he alleged); Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003) (noting that claimant left her job due to lack of transportation, not due to disability). Accordingly, the ALJ cited how the record established that Claimant ceased work activity due to other reasons than impairment-related reasons as another factor in support of Claimant's ability to work. See Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) ("It was also not unreasonable for the ALJ to note that Harris's ... part-time work [was] inconsistent with her claim of disabling pain.").

out inconsistencies in the record that tended to militate against the Claimant's credibility. Those included Claimant's minimal treatment for pain, her lack of work restrictions by any physicians, and her normal daily activities. The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). Accordingly, the ALJ did not err in discrediting Claimant's subjective complaints of constant pain. See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001)(affirming the ALJ's decision that claimant's complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment was not consistent with amount of pain described at hearing, that level of pain described by claimant varied among her medical records with different physicians, and that time between doctor's visits was not indicative of severe pain).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that the final decision of

the Commissioner denying social security benefits be **AFFIRMED**.

Judgment shall be entered accordingly.

_____/s/Terry I. Adelman_____
UNITED STATES MAGISTRATE  JUDGE

Dated this _29th_ day of March, 2010.